Filed 9/25/25 (unmodified opn. attached)

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHRISTOPHER BALDWIN,<br><br>    Defendant and Appellant. | F088265<br><br>(Tulare Super. Ct. No. VCF080161-01)<br><br>**ORDER MODIFYING OPINION**<br>**[NO CHANGE IN JUDGMENT]** |

IT IS ORDERED that the published opinion filed herein on August 27, 2025, be modified as follows:

1.      On page 8, the first sentence of the first full paragraph is deleted and replaced with the following sentence:

> After the United States Supreme Court's decisions in *Graham* and *Miller*, our Legislature enacted Senate Bill No. 9 (2011–2012 Reg. Sess.) (Senate Bill 9) that added subdivision (d)(2) to section 1170; the added subdivision became effective January 1, 2013, and created a recall and resentencing provision for juveniles sentenced to an explicit term of LWOP.

There is no change in the judgment.

MEEHAN, J.

WE CONCUR:

DETJEN, Acting P. J.

FRANSON, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F088265 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. VCF080161-01) |
| CHRISTOPHER BALDWIN, | **OPINION** |
| Defendant and Appellant. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County. Nathan G. Leedy, Judge.

Tonja R. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Ian Whitney and Hannah Janigian Chavez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant Christopher Baldwin was sentenced to 44 years to life stemming from the aggravated sexual assault of his neighbor when he was 16 years old. In 2024, he petitioned for resentencing relief under Penal Code section 1170, subdivision (d) (section 1170(d))[1] and pursuant to *People v. Heard* (2022) 83 Cal.App.5th 608 (*Heard*). Section 1170(d)(1)(A) affords an opportunity for recall and resentencing only to those juveniles who were sentenced to an explicit term of life without parole (LWOP). *Heard* held that section 1170(d) violates equal protection principles to the extent it excludes from relief those juveniles sentenced to the functional equivalent of LWOP. (*Heard, supra*, at p. 612.) In considering appellant's section 1170(d) petition under *Heard*'s equal protection analysis, the trial court concluded appellant's sentence was not the functional equivalent of LWOP, and denied relief under section 1170(d)(1)(A).

On appeal, appellant argues the functional equivalence of LWOP should be determined under the formulation of functional equivalency articulated by the California Supreme Court in *People v. Contreras* (2018) 4 Cal.5th 349 (*Contreras*) in the context of the federal Constitution's Eighth Amendment. *Contreras* analyzed whether sentences of 50 and 58 years to life imposed on juveniles for nonhomicide crimes were functionally equivalent to juvenile LWOP sentences the United States Supreme Court had categorically prohibited in *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*) and were, therefore, unlawful under the Eighth Amendment. *Contreras* centered its Eighth Amendment functional equivalence assessment on *Graham*, evaluating whether the juvenile sentences at issue provided the type of "'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation'" that *Graham* requires, and ultimately found the sentences unlawful under the Eighth Amendment. (*Contreras, supra*, at p. 367, quoting *Graham, supra*, at p. 75.)

---

[1]    Further statutory references are to the Penal Code unless otherwise indicated.

The Courts of Appeal are presently split on whether *Contreras*'s Eighth Amendment formulation of functional equivalency applies to equal protection challenges to section 1170(d) based on *Heard*, and whether a sentence of 50 years to life for homicide crimes constitutes the functional equivalent of LWOP in that context. In *People v. Cabrera* (2025) 111 Cal.App.5th 650 (*Cabrera*), our colleagues in the Second District Court of Appeal, Division Five, relied on *Contreras* in concluding a sentence of 50 years to life for first degree murder committed by a juvenile when he was 15 years old was the functional equivalent of LWOP in the context of an equal protection challenge to section 1170(d) and, thus, under *Heard*, denying the petitioner relief violated equal protection principles. (*Cabrera, supra*, at p. 653.) Arriving at a different conclusion, our colleagues in the Second District Court of Appeal, Division Seven, distinguished *Contreras* in *People v. Munoz* (2025) 110 Cal.App.5th 499 (*Munoz*), review granted June 25, 2025, S290828, and concluded a sentence of 50 years to life for first degree murder committed by a 15-year-old juvenile was not the functional equivalent of LWOP in the context of an equal protection challenge to section 1170(d). (*Munoz, supra*, at pp. 503, 512, review granted.)

In accord with *Munoz*, our colleagues in the Second District Court of Appeal, Division Three, likewise concluded in *People v. Thompson* (2025) 112 Cal.App.5th 1058 (*Thompson*) that section 1170(d)(1)(A)'s exclusion of a petitioner's sentence of 50 years to life for first degree murder committed when he was 17 years old did not violate equal protection. *Thompson* reasoned *Contreras*'s Eighth Amendment functional equivalency analysis was distinct from, and should not be conflated with, an equal protection analysis regarding section 1170(d). (*Thompson, supra*, at pp. 1075–1082.) Rather than importing *Contreras*'s Eighth Amendment functional equivalency formulation, the court structured its analysis of the petitioner's equal protection challenge to section 1170(d) around the California Supreme Court's recent equal protection decisions in *People v. Hardin* (2024) 15 Cal.5th 834 (*Hardin*) and *People v. Williams* (2024) 17 Cal.5th 99 (*Williams*).

3.

Having granted review in *Munoz*, our Supreme Court is poised to address whether a juvenile homicide offender sentenced to 50 years to life in prison is entitled to recall and resentencing under section 1170(d)(1) on the ground that the sentence is the functional equivalent of LWOP. While we await further guidance from our high court on this question and the analytical framework to answer it, we are persuaded by *Thompson*'s conclusion that an equal protection analysis to section 1170(d) requires "an equal protection specific" analysis that is not centered on Eighth Amendment concerns (*Thompson, supra*, 112 Cal.App.5th at p. 1073), and we join in that court's reasoning.

For the reasons that follow, we affirm the trial court's denial of appellant's petition. We find appellant has failed to demonstrate—as is his burden—that section 1170(d)'s limitation on eligibility to those sentenced to LWOP has no rational basis, and is therefore unconstitutional under the Fourteenth Amendment, as applied to juvenile nonhomicide offenders sentenced to 44 years to life.

## FACTUAL BACKGROUND

In 2001, when appellant was 16 years old, he broke into the home of his 54-year-old former neighbor, and attacked her in her sleep with a knife. While wearing a mask, appellant held her at knifepoint and, over a two and one-half hour period, proceeded to rape and sodomize her, and then forced her to orally copulate him. Afterwards, he forced her to wash her genitals and left her in a bathtub while he proceeded to take her cash and jewelry; when he left her house, she fled to a neighbor's home and called the police.[2]

In May 2002, appellant was convicted of three counts of forcible rape (§ 261, subd. (a)(2); counts 1–3); two counts of forcible oral copulation (former § 288a,

---

[2] The facts are drawn from this court's nonpublished opinion in appellant's direct appeal, *People v. Baldwin* (Apr. 8, 2004, F041079), of which we take judicial notice. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

subd. (c)(2); counts 4–5)[3]; forcible sodomy (§ 286, subd. (c)(2); count 6); sexual battery by restraint (§ 243.4, subd. (a); count 7); home invasion robbery (§ 211; count 8); residential burglary (§ 459; count 9); dissuading a witness by threats of force or violence (§ 136.1, subd. (c)(1); count 10); and making terrorist threats (§ 422; count 11).

The jury found true allegations under the One Strike law (§ 667.61 et seq.) that counts 1–6 were committed during a burglary (*id.*, subds. (d)(4), (e)(2)), and that appellant used a dangerous and deadly weapon (*id.*, former subd. (e)(4)); as to these counts, the jury also found true a weapon enhancement allegation for use of the knife (§ 12022.3, subd. (a).) As to counts 1, 4, 5 and 6, the jury found true an additional One Strike allegation that appellant had tied and bound the victim (§ 667.61, former subd. (e)(6)). As to counts 7–11, the jury found true an enhancement for personal use of a knife (§ 12022, subd. (b)(1)).

Appellant was sentenced to a determinate term of 16 years four months followed by a consecutive term of 25 years to life. On count 1, he was sentenced to 25 years to life, plus 10 years for the knife enhancement. As to counts 2–6, appellant was sentenced to concurrent terms of eight years, plus 10 years for the knife enhancement. As to count 8, appellant was sentenced to four years, plus one year for the knife enhancement. As to count 10, appellant was sentenced to one year, plus four months for the knife enhancement. The execution of the sentences on counts 7, 9 and 11 was stayed under section 654.

In March 2013, appellant's sentence on count 10 was modified to three years, plus one year for the knife enhancement, resulting in a determinate term of 19 years, followed by a consecutive term of 25 years to life—effectively a term of 44 years to life.

---

[3] Former section 288a was renumbered to section 287 effective January 1, 2019. (Stats. 2018, ch. 423, § 49.)

Appellant filed a petition for recall and resentencing under section 1170(d) in January 2024, which the prosecution opposed. In June 2024, the trial court denied the petition, finding appellant's sentence was not the functional equivalent of LWOP, and no relief was available based on *Heard*'s equal protection analysis.

## DISCUSSION

On appeal, appellant argues, and the Attorney General tacitly agrees, that *Contreras* controls the analytical framework for purposes of an equal protection challenge to section 1170(d) insofar as it pertains to the doctrine of functional equivalency. Appellant points to various statistics, statutory authority, and out-of-jurisdiction Eighth Amendment cases to support his contention that parole eligibility at 60 years old (as his sentence provides) offers him no meaningful opportunities for release within his lifetime under *Contreras*'s functional equivalency analysis centered on *Graham*. As such, he contends his sentence is functionally equivalent to LWOP for purposes of section 1170(d) and, pursuant to *Heard*, no rational bases support section 1170(d)'s limitation to eligibility for relief to those sentenced expressly to LWOP.

Although the Attorney General initially conceded appellant's sentence was the functional equivalent of LWOP for purposes of equal protection under section 1170(d), that concession was withdrawn in supplemental briefing. Relying largely on *Contreras*, the Attorney General now maintains only sentences of 50 years to life or greater are the functional equivalent of LWOP in this context.[4]

---

[4]    In their supplemental briefs, we also asked the parties to address appellant's eligibility to earn conduct credits at the time he was originally sentenced and, if he was eligible, whether that affects the parties' respective functional equivalency arguments. Our equal protection analysis does not consider appellant's eligibility for conduct credits, or any date the Department of Corrections and Rehabilitation may have calculated for appellant's parole eligibility.

We begin with a legal background summary to provide context for our consideration of appellant's equal protection challenge.

I.      **Legal Background**

A.      **Functional Equivalence of LWOP in the Eighth Amendment Context**

The law governing juvenile punishment has undergone a sea change since appellant was sentenced in 2002, "based upon developments in scientific research on adolescent brain development confirming that children are different from adults in ways that are critical to identifying age-appropriate sentences." (*O.G. v. Superior Court* (2021) 11 Cal.5th 82, 88.) "As a result of this shift, the punishment that could validly be imposed on juvenile offenders was curtailed. The changes in law also restricted prosecutors' authority to charge juveniles in adult criminal court." (*People v. Bagsby* (2024) 106 Cal.App.5th 1040, 1048 (*Bagsby*).)

Beginning with *Roper v. Simmons* (2005) 543 U.S. 551, 568, the United States Supreme Court held the Eighth Amendment categorically prohibits sentencing juvenile offenders to death. In 2010, the nation's high court expanded *Roper* and held the Eighth Amendment also prohibits sentencing *nonhomicide* juvenile offenders to LWOP; only by giving such offenders "some realistic opportunity to obtain release" would punishment provided by the states comport with the Eighth Amendment. (*Graham, supra*, 560 U.S. at p. 82.) Two years later, although not extending *Graham*'s categorical LWOP ban to juvenile *homicide* offenders, the United States Supreme Court held the Eighth Amendment prohibits a sentencing scheme that makes LWOP a mandatory sentence for juvenile offenders convicted of homicide. (*Miller v. Alabama* (2012) 567 U.S. 460, 489 (*Miller*).) *Miller* outlined mitigating factors relating to youth that must be considered by the sentencing court before committing a juvenile homicide offender to prison for LWOP, and explained the "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." (*Id.* at p. 479.)

Two months after *Miller*, the California Supreme Court extended *Graham*, holding the Eighth Amendment prohibits sentencing *nonhomicide* juvenile offenders to a "term-of-years sentence that amounts to the functional equivalent of a [LWOP] sentence ...." (*People v. Caballero* (2012) 55 Cal.4th 262, 268, fn. omitted (*Caballero*).) The court's analysis centered on *Graham* and its holding that the Eighth Amendment requires the state to afford a juvenile offender a "'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation ....'" (*Caballero, supra*, at p. 266.) *Caballero* explained *Miller* had emphasized that "'none of what [*Graham*] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime specific.'" (*Caballero, supra*, at p. 267.) Rather, *Miller* had "made it clear that *Graham*'s 'flat ban' on [LWOP] sentences applies to all nonhomicide cases involving juvenile offenders, including the term-of-years sentence that amounts to the functional equivalent of a [LWOP] sentence imposed in this case." (*Caballero, supra*, at pp. 267–268, fn. omitted.) Sentenced to 110 years to life, *Caballero* explained the defendant would become parole eligible "over 100 years from now," and "he would have no opportunity to 'demonstrate growth and maturity' to try to secure his release, in contravention of *Graham*'s dictate." (*Id.* at p. 268.)

In between the United States Supreme Court's decision in *Graham* and *Miller*, our Legislature enacted Senate Bill No. 9 (2011–2012 Reg. Sess.) (Senate Bill 9) that added subdivision (d)(2) to section 1170; the added subdivision became effective January 1, 2013, and created a recall and resentencing provision for juveniles sentenced to an explicit term of LWOP. (See Stats. 2012, ch. 828, § 1.) The statute permitted a resentencing mechanism for those defendants who were under the age of 18 years at the time of the commission of their offenses and who were sentenced to LWOP. In the process of passing the bill, a legislative report included comments from the bill's author and supporters that "sentencing minors to die in prison is barbaric" (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.), as amended

8.

Aug. 15, 2011, p. 2), and discussed that the proposed remedy of recall and resentencing would, if deemed appropriate by the sentencing judge, "result in a life sentence, but one with the possibility of parole" (*ibid.*). Under the statute's new provision, a defendant was permitted to file a petition requesting recall and resentencing with the sentencing court after having been incarcerated for 15 years. (§ 1170, former subd. (d)(2)(A)(i), now subd. (d)(1)(A).)[5]

Then, effective January 1, 2014, the Legislature passed Senate Bill No. 260 (2013–2014 Reg. Sess.) (Senate Bill 260) and added sections 3051, 3046, subdivision (c), and 4801, subdivision (c) to the Penal Code "'to bring juvenile sentencing into conformity with *Graham*, *Miller*, and *Caballero*.'" (*Heard, supra*, 83 Cal.App.5th at p. 619; see § 3051, subd. (b)(1)–(3), added by Stats. 2013, ch. 312, § 4.) Section 3051 requires the Board of Parole Hearings to conduct a youthful offender parole hearing "at specified times during the incarceration of certain youthful offenders." (*People v. Sorto* (2024) 104 Cal.App.5th 435, 443–444 (*Sorto*).) Although section 3051, as originally enacted, created a schedule of youth offender parole hearings for juvenile offenders sentenced to a determinate term, a term of less than 25 years to life, or a life term of 25 years to life, it provided no parole hearing for juvenile offenders sentenced to LWOP. (*Heard, supra*, at p. 619 & fn. 8.)

The California Supreme Court considered the effect of Senate Bill 260 on a juvenile's claim of an Eighth Amendment violation in sentencing. (*People v. Franklin* (2016) 63 Cal.4th 269 (*Franklin*).) In *Franklin*, a 16-year-old defendant shot and killed another teenager, and was convicted of first degree murder with a firearm enhancement; he was sentenced to two consecutive terms of 25 years to life—i.e., 50 years to life. (*Id.* at p. 271.) *Franklin* held that, "just as *Graham* applies to sentences that are the

---

[5]     Effective January 1, 2022, section 1170, subdivision (d)(2) was renumbered as subdivision (d)(1). (Stats. 2021, ch. 731, § 1.3.)

'functional equivalent of a [LWOP] sentence' [citation], so too does *Miller* apply to such functionally equivalent sentences." (*Id.* at p. 276.) *Franklin* concluded, however, that the availability of a youth offender parole hearing under section 3051 mooted the defendant's Eighth Amendment challenge to his sentence under *Miller*. (*Franklin, supra*, at pp. 279–280.) Although the defendant remained bound by his original sentence, the court explained, by operation of Senate Bill 260, the defendant "is now serving a life sentence that includes a meaningful opportunity for release during his 25th year of incarceration. Such a sentence is neither LWOP nor its functional equivalent. Because [the defendant] is not serving an LWOP sentence or its functional equivalent, no *Miller* claim arises here." (*Franklin, supra*, at pp. 279–280.)

Subsequently, in 2017, our Supreme Court held that section 1170(d) was an inadequate statutory mechanism to cure an error under *Miller*. (*In re Kirchner* (2017) 2 Cal.5th 1040, 1054–1055 (*Kirchner*.) The court explained that section 1170(d) provided "only a selective and qualified remedy … premised on an inquiry that may, but does not necessarily, overlap with the one demanded under *Miller*." (*Kirchner, supra*, at pp. 1054–1055.) In response to *Kirchner*, the Legislature amended section 3051 to add subdivision (b)(4), which provides juveniles sentenced to LWOP a youth offender parole hearing during their 25th year of incarceration. (§ 3051, subd. (b)(4), added by Stats. 2017, ch. 684, § 1.5.) Nevertheless, the Legislature did not repeal section 1170(d).

Months after section 3051 was amended, our Supreme Court again considered the legality of juvenile sentences under the Eighth Amendment for nonhomicide offenses in *Contreras*. Although not sentenced to the 110-year-to-life term in *Caballero*, two juveniles had been sentenced to 50 and 58 years to life for One Strike nonhomicide offenses and were ineligible for youth offender parole hearings under section 3051. (*Contreras, supra*, 4 Cal.5th at p. 359.) The court centered its analysis on *Graham*'s Eighth Amendment requirement that nonhomicide juvenile offenders must be given

10.

"'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'" (*Contreras, supra*, at p. 367.)

Through the lens of *Graham*, the court reasoned a lawful sentence under the Eighth Amendment must "recognize 'a juvenile nonhomicide offender's capacity for change and limited moral culpability'"; "offer 'hope of restoration'"; offer "'a chance to demonstrate maturity and reform'"; provide a "'chance for fulfillment outside prison walls,' and a 'chance for reconciliation with society'"; and offer "the juvenile offender an 'incentive to become a responsible individual.'" (*Contreras, supra*, 4 Cal.5th at p. 367.) Given these guidelines, *Contreras* held a sentence of 50 years to life is functionally equivalent to LWOP for a juvenile nonhomicide offender because it does not provide the opportunities *Graham* requires. *Contreras* explained *Graham* "envisioned more than the mere act of release or a de minimis quantum of time outside of prison.… Confinement with no possibility of release until age 66 or age 74 seems unlikely to allow for the reintegration that *Graham* contemplates." (*Contreras, supra*, at p. 368.)

### B.     Eighth Amendment Arguments in the Equal Protection Context

After *Contreras*, our high court considered constitutional questions about youth offender parole opportunities provided under section 3051 in *Hardin, supra*, 15 Cal.5th 834 and *Williams, supra*, 17 Cal.5th 99. In *Hardin,* the defendant was serving an LWOP sentence for a special circumstance murder he committed at age 25. (*Hardin, supra*, at p. 839.) Although section 3051 permitted youth offender parole hearings for most offenders incarcerated for a crime they committed between ages 18 and 25, the statute excluded from youth offender parole hearings those serving LWOP for a crime they committed after the age of 18. (*Hardin, supra*, at p. 838.) The defendant argued section 3051 violated the Fourteenth Amendment's equal protection guarantee by excluding from early parole opportunities young adult offenders sentenced to LWOP for special circumstance murder, but extending parole opportunities to young adult offenders serving parole-eligible life sentences for other crimes. Our high court ultimately

11.

concluded the Legislature had a rational basis for the exclusion of young adults sentenced to LWOP based on its concerns about culpability and the appropriate level of punishment for certain very serious crimes. (*Hardin, supra*, at pp. 853–864.)

Notably, the court rejected the defendant's argument premised on the functional equivalence doctrine: a young adult offender sentenced to a lengthy term-of-years sentence that is functionally equivalent to LWOP would be entitled to a youth offender parole hearing, while a young adult offender serving an explicit sentence of LWOP would not. (*Hardin, supra*, 15 Cal.5th at p. 863.) The appellate court below had concluded this distinction was irrational because it permitted parole hearings for those defendants with lengthy term-of-years sentences who perhaps had committed multiple violent crimes and were, in some cases, sentenced to the functional equivalence of LWOP, while denying a parole opportunity to those defendants explicitly sentenced to LWOP, perhaps for only a single crime. (*Id.* at p. 842.) The appellate court reasoned the seriousness of the offender's crimes was only a superficially plausible justification for the distinction. (*Ibid.*) In raising this culpability issue before the Supreme Court, the defendant noted the high court had previously described aggregate sentences that fix parole eligibility outside an offender's life expectancy as the functional equivalence of LWOP, and essentially argued a sentence functionally equivalent to LWOP could involve the same degree of culpability as those sentenced to LWOP, making a distinction based on culpability an irrational one. (*Id.* at p. 863.)

In rejecting this argument, our high court explained it had "employed that [functional equivalence] description in the context of identifying the category of juvenile offenders to whom the Eighth Amendment limitations on [LWOP] sentences apply; for that purpose, what matters is only whether the sentence, by its nature, forecloses any realistic chance for a juvenile offender to rejoin society. [Citation.] We have not held that a lengthy term-of-years sentence is necessarily equivalent to a [LWOP] sentence for all purposes. Nor, more specifically, have we suggested that a set of crimes punishable

12.

by a lengthy term-of-years sentence is necessarily more culpable, or equivalent in culpability, to a single crime for which the law prescribes a sentence of [LWOP].” (*Hardin, supra*, 15 Cal.5th at pp. 863–864.)

Finally, in *Williams*, our high court again considered an equal protection challenge to section 3051—this time based on its exclusion of all youth offenders sentenced under the One Strike law. (*Williams, supra*, 17 Cal.5th at pp. 112–113.) The defendant argued there was no rational basis to exclude One Strike offenders, which involve nonhomicide offenses, but not those convicted of first degree murder from parole eligibility. (*Id.* at p. 125.) The defendant's argument was premised, in part, on *Graham*'s statement “that homicide offenses differ ‘in a moral sense’ from nonhomicide offenses in terms of ‘“their ““severity and irrevocability.”’”” (*Williams, supra*, at p. 125, quoting *Graham, supra*, 560 U.S. at p. 69.)

The high court observed “[t]his argument based on the comparative seriousness of crimes, however, is premised on concerns relevant in the context of Eighth Amendment challenges to the death penalty and other severe criminal penalties, such as juvenile LWOP; such concerns do not necessarily establish whether a Legislature's classification violates equal protection under a rational basis standard.” (*Williams, supra*, 17 Cal.5th at p. 131.) The court acknowledged section 3051 “was crafted to ‘bring juvenile sentencing in conformity with *Miller*, *Graham* and *Caballero*’ [citation], and to that end, Eighth Amendment ‘protections outlined in *Miller*’ are featured in this provision. [Citation.] However, despite ‘language echoing the holdings of these cases’ [citation], this equal protection analysis of section 3051 should not be conflated with principles governing the Eighth Amendment's prohibition against cruel and unusual punishment and its focus on punishment and proportionality in capital and juvenile sentencing.” (*Williams, supra*, at p. 131.) Based on recidivism concerns and that the aggravated nature of their offenses diminished their prospects for rehabilitation, the court ultimately concluded the Legislature “had a rational reason to categorically exclude young adult One Strike

13.

offenders, but not young adults convicted of non-special-circumstance murder, from early parole consideration under section 3051." (*Id.* at p. 133.)

### C. Equal Protection Challenges to Section 1170(d)(1)(A) and Sentences Functionally Equivalent to LWOP

The concept of functional equivalence of LWOP also arose in the context of equal protection challenges to section 1170(d). Section 1170(d) permits a defendant who was under the age of 18 at the time of the commission of the offense for which the defendant was sentenced to LWOP and has been incarcerated for at least 15 years, to submit a petition for recall and resentencing to the sentencing court. (§ 1170(d)(1)(A).)

In *Heard*, decided before *Hardin* or *Williams*, the court addressed an equal protection challenge to section 1170(d) and its exclusion of juveniles who were not sentenced to an explicit term of LWOP. The defendant, who had been sentenced to a term of 103 years to life, argued his sentence was the functional equivalent of LWOP, and if section 1170(d)(1) was not interpreted to apply to his sentence, then it violated his right to equal protection. As matter of statutory construction, the court first determined the plain language of section 1170(d)(1)(A) limited eligibility for recall and resentencing to juvenile offenders sentenced explicitly to LWOP. (*Heard, supra*, 83 Cal.App.5th at p. 626.) Turning to the equal protection challenge, the court first concluded the defendant was similarly situated to those offenders sentenced explicitly to LWOP because his sentence was "the functional equivalent" of LWOP. (*Id.* at p. 629.) In making this determination, the court embraced no specific analytical method for determining what term-of-years sentence constituted the functional equivalent of LWOP; instead, the court relied on *Caballero*'s application of functional equivalency and explained the defendant would have to serve 103 years before becoming parole eligible, which "constitutes a de facto [LWOP] sentence." (*Heard, supra*, at p. 629.)

On the second prong of the analysis, the court found it could "conceive of no legitimate reason for making juvenile offenders sentenced to explicit [LWOP] terms

14.

eligible to seek resentencing but not juvenile offenders sentenced to the equivalent of a [LWOP] sentence." (*Heard, supra*, 83 Cal.App.5th at p. 632.)  The court reasoned the Legislature could not rationally base the distinction on the excessiveness of an LWOP sentence because the same concern applies to those with a functionally equivalent term-of-years sentence.  (*Ibid.*)  Differential treatment also could not be justified, the court reasoned, by differences in the relative culpability of each group.  The statute had the "incongruous effect" of extending sentencing leniency (resentencing) to those offenders generally regarded as the least deserving of it—i.e., juveniles convicted of first degree murder whose cases involve a special circumstance finding whose punishment is explicit LWOP.  (*Id.* at p. 633.)  The court also considered, and rejected, whether the Legislature might have viewed a juvenile whose multiple offenses caused a lengthy term-of-years sentence as more deserving of severe punishment.  The court pointed out section 1170(d)(1)(A) includes those with explicit LWOP sentences regardless of whether they are convicted of other additional offenses, so the number of offenses theoretically committed by each group of offenders (LWOP offenders versus de facto LWOP offenders) failed to justify their disparate treatment.  (*Heard, supra*, at p. 633.)

Two years later, in *Sorto*, the court reviewed the denial of a section 1170(d) petition where the defendant had been sentenced to a determinate term of 10 years, plus an indeterminate term of 130 years to life.  (*Sorto, supra*, 104 Cal.App.5th 435.)  The appellate court confirmed *Heard*'s equal protection analysis, and concluded neither *Hardin* nor *Franklin* undercut it.[6]  Consistent with *Heard*, the court found there was no

---

[6]     In *People v. Ortega* (2025) 111 Cal.App.5th 1252, our colleagues in the Fourth District Court of Appeal, Division Three, parted company with *Heard* and *Sorto* regarding how eligibility for a youth offender parole hearing under section 3051 affects an equal protection challenge to section 1170(d).  (*Ortega, supra*, at pp. 1263–1264.)  Relying on *Franklin*, the court in *Ortega* reasoned that because the defendant was eligible for a section 3051 youth offender parole hearing, his sentence of 42 years to life had been converted by operation of law to a sentence of 25 years to life.  Based on this, the court concluded the defendant's sentence was not the functional equivalent of LWOP, and the

rational basis for section 1170(d) to exclude from relief those juveniles serving sentences that were the functional equivalent of LWOP. The court rejected the Attorney General's arguments the Legislature had a rational basis to distinguish LWOP as a response to *Graham*; or based on moral principles; empirical facts; fiscal concerns; and relative culpability. (*Sorto, supra*, at pp. 450–454.)

After *Sorto*, the Fourth District Court of Appeal in *Bagsby* rejected the Attorney General's argument *Heard* was wrongly decided, and concluded a sentence of 107 years to life for offenses committed when the juvenile was 15 years old was the functional equivalent of LWOP, and there was no rational basis for section 1170(d) to differentiate between LWOP and those sentenced to de facto LWOP. (*Bagsby, supra*, 106 Cal.App.5th at pp. 1054–1067.)

Like *Caballero*, these section 1170(d) cases (*Heard*, *Sorto* and *Bagsby*) involved term-of-years sentences with a parole eligibility date that was unquestionably beyond the juvenile's natural life span. None of these cases confronted how functional equivalence should be assessed when a defendant's term-of-years sentence could potentially offer a parole opportunity *inside* the juvenile's natural life. Courts have varied as to the rationale for making this determination in the equal protection context and exactly where the line should be drawn for functional equivalence when a term-of-years sentence offers an opportunity for parole that is probably, or at least possibly, inside the juvenile's natural life expectancy.

For example, in *People v. Olmos* (2025) 109 Cal.App.5th 580, our colleagues in the Second District Court of Appeal, Division Five, concluded a sentence of 33 years to

---

defendant's equal protection challenge to section 1170(d) was moot. (*Ortega, supra*, at pp. 1264–1265.) Prior to *Ortega*, *Heard* and *Sorto* had declined to adopt similar reasoning and had concluded that, although section 3051 may change how a defendant's sentence currently operates, section 1170(d)'s plain language requires only that a defendant "was sentenced" to an LWOP term. (*Heard, supra*, 83 Cal.App.5th at p. 629; accord, *Sorto, supra*, 104 Cal.App.5th at pp. 447–448.)

life is not the functional equivalent of LWOP for purposes of section 1170(d) pursuant to *Heard*'s equal protection analysis. Accepting *Heard*'s equal protection analysis arguendo, the court reasoned a 33-year-to-life sentence was readily distinguishable from the sentence of 103 years to life in *Heard* (*Heard, supra*, 83 Cal.App.5th at p. 629), 140 years to life in *Sorto* (*Sorto, supra*, 104 Cal.App.5th at pp. 439–440), and was far shorter than the 50- and 58-year sentences imposed on the juveniles in *Contreras* (*Contreras, supra*, 4 Cal.5th at p. 367). (*Olmos, supra*, at p. 583.)

In *Munoz*, a split panel of our colleagues in the Second District Court of Appeal, Division Seven, concluded that a 50-year-to-life term for a juvenile homicide offender is not the functional equivalent of LWOP in the context of an equal protection challenge to section 1170(d). The majority distinguished *Heard*, *Sorto*, and *Bagsby* because those cases involved minimum parole eligibility dates far greater than 50 years. (*Munoz, supra*, 110 Cal.App.5th at pp. 510–512, review granted.) Despite that *Caballero*, a nonhomicide Eighth Amendment case, "gave some guidance" about how to ascertain functional equivalency, *Munoz* concluded it was not controlling and similarly distinguishable. (*Munoz, supra*, at p. 508, review granted.) *Caballero*, like *Heard*, *Sorto*, and *Bagsby*, considered a defendant with parole eligibility after more than 100 years—a sentence that obviously would not provide a meaningful opportunity to secure release during the juvenile's expected lifetime. *Munoz* reasoned that unlike the defendant in *Caballero*, Munoz would be 65 years old when he became eligible for parole, and thus *would* have a realistic opportunity to obtain release from prison during his expected lifetime. (*Munoz, supra*, at p. 508, review granted.)

In declining to consider various extra-record evidence showing Munoz would likely die in prison before reaching his parole eligibility date, the court explained the data was not presented to the trial court, and it would not evaluate its untested validity. (*Munoz, supra*, 110 Cal.App.5th at pp. 508–509, review granted.) The court also noted it was the function of the Legislature, not the courts, to sift through studies and research to

make policy decisions. (*Id.* at p. 509, review granted.) The *Munoz* majority also reasoned that *Contreras*'s formulation of functional equivalency did not govern the analysis because it was an Eighth Amendment case in a nonhomicide context. (*Munoz, supra*, at pp. 510–511, review granted.)

The dissent in *Munoz* maintained *Contreras*'s reasoning "must inform" the functional equivalence analysis for equal protection purposes as section 1170(d) "was enacted in response to the principles articulated in *Graham*[, *supra*,] 560 U.S. 48—the decision at the heart of *Contreras*." (*Munoz, supra*, 110 Cal.App.5th at p. 513, review granted (dis. opn. of Feuer, J.).) The dissent relied on various studies and statistics cited by the defendant and amici curiae filings, including those showing the average age of death of California inmates between 2010 and 2012 was 54–55 years of age (*id.* at p. 515, review granted); and how juveniles are disproportionately subjected to childhood trauma that is linked to higher mortality rates (*id.* at p. 517, review granted). The dissent concluded that a term of 50 years to life imposed on a 15- or 16-year-old "is the functional equivalent of an LWOP sentence because a substantial percentage of juvenile offenders will die in prison or be released at the end of their lifetimes, without a meaningful opportunity to become productive members of society." (*Id.* at p. 517, fn. omitted, review granted.)

Subsequently, relying on *Contreras*, our colleagues in the Second District Court of Appeal, Division Five, concluded a 50-year-to-life sentence for a juvenile homicide offender is functionally equivalent to LWOP for equal protection purposes under section 1170(d). (*Cabrera, supra*, 111 Cal.App.5th at p. 653.) A separate concurring statement explained that, "[w]ere the slate clean, I would defer to our Legislature's decision as to where to draw the line between entitlement and nonentitlement to relief under … section 1170, subdivision(d)(1)(A)—at least in a case, like this one, where the question presented is whether there is a rational basis to distinguish a sentence of 50 years to life from a [LWOP] sentence. However, our Supreme Court's holding in

*People v. Contreras* (2018) 4 Cal.5th 349, 369 … is, in my view, inescapable and indistinguishable." (*Id.* at p. 654 (conc. opn. of Hoffstadt, P.J.).)

Finally, and most recently, our colleagues in the Second District Court of Appeal, Division Three, agreed with the majority in *Munoz* that section 1170(d)'s exclusion of a juvenile sentenced to 50 years to life for a homicide offense did not violate equal protection principles. (*Thompson, supra*, 112 Cal.App.5th at p. 1072.) *Thompson* explained that *Contreras* had limited the question before it regarding functional equivalence "'*to the Eighth Amendment concerns that constrain lawful punishment for juvenile nonhomicide offenders .…*'" (*Thompson, supra*, at p. 1072, quoting *Contreras, supra*, 4 Cal.5th at p. 364.) *Thompson* found this to specifically tether the functional equivalence question before *Contreras* to the Eighth Amendment, particularly in light of the high court's statements in *Hardin* and *Williams* "rejecting attempts to collapse the separate Eighth and Fourteenth Amendment analyses into one." (*Thompson, supra*, at p. 1074, citing *Williams, supra*, 17 Cal.5th at p. 131 & *Hardin, supra*, 15 Cal.5th at p. 863.)

Thus, *Thompson* explained, because *Contreras* had addressed functional equivalence under Eighth Amendment standards, and *not* under the equal protection guarantee of the Fourteenth Amendment, its Eighth Amendment concerns in determining functional equivalency did not extend to an equal protection challenge under section 1170(d). For purposes of equal protection, *Thompson* explained, rather than "asking whether a 50-year-to-life term functions like [LWOP] with respect to Eighth Amendment concerns that constrain lawful punishment for juvenile nonhomicide offenders, we must ask whether "'a statutory distinction [between [LWOP] and a 50-year-to-life term] is so devoid of even minimal rationality that it is unconstitutional as a matter of equal protection.""" (*Thompson, supra*, 112 Cal.App.5th at p. 1074, quoting *Williams, supra*, 17 Cal.5th at p. 123 & citing *Munoz, supra*, 110 Cal.App.5th at p. 510, review granted.)

Turning to the equal protection analysis, *Thompson* noted that although Senate Bill 9's legislative history indicates *Graham* violations and cruel or disproportionate sentences imposed on juveniles were among the Legislature's general considerations in enacting section 1170(d), "it was expressly concerned about juveniles being sentenced to *die* in prison." (*Thompson, supra*, 112 Cal.App.5th at p. 1075.) After examining various legislative reports analyzing Senate Bill 9, the court concluded those materials suggested "the Legislature's concern was not merely excessive punishment of juveniles that failed to take into consideration their capacity for change, or even lengthy sentences. Instead, a specific goal was to provide an opportunity for juvenile offenders whose sentences ensured they would die in prison." (*Thompson, supra*, at p. 1076.) *Thompson* pointed out the defendant had not shown these concerns stated in the legislative materials would have applied equally to sentences of 50 years to life as to sentences of LWOP. (*Ibid.*)

*Thompson* also found the Legislative history established the Legislature intended to proceed incrementally with respect to addressing the larger problem of excessive punishment for juveniles. (*Thompson, supra*, 112 Cal.App.5th at p. 1076.) Senate Bill 9 was described as a "'modest and narrowly focused piece of legislation'" (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.) as introduced Dec. 6, 2010, p. 11), which financial reports indicated would apply to only 293 California inmates (Sen. Appropriations Com. Fiscal Summary of Sen. Bill No. 9 (2011–2012 Reg. Sess.) as introduced Dec. 6, 2010, pp. 1, 2). At the time of enactment, *Thompson* reasoned, the Legislature could reasonably have considered LWOP to be the most severe and unjust punishment imposed on juvenile offenders, and it could have rationally concluded that "providing the relatively small number of juvenile offenders otherwise certain to die in prison an opportunity to obtain a lesser sentence was the most pressing priority." (*Thompson, supra*, at p. 1077.) In light of that objective, the court reasoned it was rational for the Legislature to distinguish only juveniles sentenced to LWOP as compared to those with terms of 50 years to life because, prior to enactment of

section 3051, it was only juveniles sentenced to LWOP who had a "100 percent chance of dying in prison." (*Thompson, supra*, at p. 1078.)

The court rejected the defendant's arguments of irrationality with respect to culpability, pointing to rational bases the Legislature may have had to benefit LWOP juveniles who, unlike those with lengthy term-of-years sentences, could not benefit from conduct credit and could be deprived of educational and rehabilitative opportunities, even if they had theoretically committed more egregious offenses than those serving lesser term-of-years sentences. (*Thompson, supra*, 112 Cal.App.5th at p. 1080.) Finally, *Thompson* joined *Munoz* in acknowledging that difficult questions remain regarding sentences with parole eligibility closer to the end of a juvenile's natural life expectancy, but noted its review was limited to the specific question before it. (*Thompson, supra*, at p. 1081.)

Against this backdrop, we turn to the specific equal protection challenge defendant makes with respect to his sentence of 44 years to life.

## II. Analysis

### A. *Contreras*'s Eighth Amendment Analysis

Focusing on functional equivalency as assessed in Eighth Amendment case authority and the point at which a term-of-years sentence "'provide[s] a realistic opportunity to reintegrate into society'" (quoting *Contreras, supra*, 4 Cal.5th at p. 377), appellant maintains his sentence of 44 years to life is the functional equivalent of LWOP for purposes of an equal protection challenge to section 1170(d)(1)(A). He emphasizes the diminished probability of receiving parole at his first opportunity; actuarial statistics that indicate incarcerated individuals age faster and are more likely to die at younger ages than nonincarcerated individuals; and statutory and case authority generally consistent with these actuarial statistics. As such, being parole eligible at age 60, appellant maintains, does not provide a realistic opportunity to reintegrate into society, rendering his sentence functionally equivalent to LWOP. After concluding his sentence is de facto

21.

LWOP, appellant relies on *Heard*'s analysis and conclusion there are no rational bases to distinguish between LWOP and de facto LWOP under section 1170(d), which, therefore, establishes section 1170(d)(1)(A)'s limit on eligibility to those sentenced to LWOP violates equal protection principles as applied to his 44-year-to-life sentence.

The Attorney General initially conceded appellant's sentence is the functional equivalent of LWOP, and that the trial court's denial of his petition was error under *Heard*. After we requested the parties file supplemental briefs related to this issue, the Attorney General withdrew his concession as to functional equivalence. Heavily relying on *Contreras* and other out-of-jurisdiction Eighth Amendment case law, the Attorney General maintains only a sentence of 50 years to life or more for a juvenile offender is the functional equivalent of LWOP for purposes of equal protection.

Although they reach different conclusions, both parties analyze appellant's equal protection challenge by importing *Contreras*'s Eighth Amendment formulation of functional equivalence and applying it in a manner that generally mirrors *Heard*'s traditional two-step equal protection analysis. *Heard* relied on *Caballero*—an Eighth Amendment case—for its formulation of functional equivalence to LWOP to conclude a term of 107 years to life was functionally equivalent to LWOP such that the two groups were similarly situated. (*Heard, supra*, 83 Cal.App.5th at p. 629.) Yet, different from the 110-year-to-life sentence in *Caballero* that clearly exceeded natural life expectancy and lent itself to a "straightforward" conclusion it was functionally equivalent to LWOP in an actuarial sense, the question of functional equivalence presented in *Contreras* was different. (*Contreras, supra*, 4 Cal.5th at p. 364.)

In *Contreras*, the term-of-years sentences did not clearly exceed the offenders' respective lifespans, and presented a more complex question about whether such sentences nonetheless "impinge[d] on the same substantive concerns that make the imposition of LWOP on juvenile nonhomicide offenders impermissible under the Eighth Amendment." (*Contreras, supra*, 4 Cal.5th at p. 364.) The functional equivalence issue

22.

addressed in *Contreras* was shaped around Eighth Amendment concerns and expressly limited to whether "a term-of-years sentence may function like LWOP *with respect to the Eighth Amendment concerns that constrain lawful punishment for juvenile nonhomicide offenders* …." (*Contreras, supra*, at p. 364.) *Contreras* answered this question under the lens of *Graham*, analyzing whether sentences of 50 and 58 years to life provided the defendants with a "'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'" (*Contreras, supra*, at p. 367.)

Here, unlike *Caballero* or *Heard*, appellant's sentence of 44 years to life and offering parole eligibility at age 60 is not clearly outside his natural lifetime. Although appellant's sentence is more akin to the sentences confronted in *Contreras*, the functional equivalence analysis in *Contreras* was built on, and expressly tethered to, Eighth Amendment concerns that do not necessarily extend to an equal protection analysis under the Fourteenth Amendment. As observed in our Supreme Court's recent equal protection opinions, Eighth Amendment concerns "do not necessarily establish whether a Legislature's classification violates equal protection under a rational basis standard" (*Williams, supra*, 17 Cal.5th at p. 131), and our high court has "not held that a lengthy term-of-years sentence is necessarily equivalent to a [LWOP] sentence for all purposes" (*Hardin, supra*, 15 Cal.5th at p. 863). We understand from these cases that *Contreras*'s formulation of functional equivalency, particularly with its focus on Eighth Amendment concerns, does not necessarily apply to other legal contexts and analyses without regard for the nature of the legal question presented.

The Eighth Amendment's ban on cruel and unusual punishments "flows from the basic 'precept of justice that punishment for [a] crime should be graduated and proportioned to [the] offense'"; the Eighth Amendment's meaning is drawn from "'evolving standards of decency that mark the progress of a maturing society,'" which "must embrace and express respect for the dignity of the person, and the punishment of criminals must conform to that rule." (*Kennedy v. Louisiana* (2008) 554 U.S. 407, 419,

420.) Assessing punishment under the Eighth Amendment "requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question." (*Graham, supra*, 560 U.S. at p. 67.)

Differently, the Fourteenth Amendment's equal protection guarantee is meant to "'ensure[] that the government does not treat a group of people unequally without some justification'"; it "'confers no substantive rights and creates no substantive liberties'"; its function "'is simply to measure the validity of classifications created by state laws.'" (*Williams, supra*, 17 Cal.5th at p. 122.) Appellant does not make a claim under the Eighth Amendment; he challenges section 1170(d) on equal protection grounds under the Fourteenth Amendment.[7] Rather than analyzing a sentence's functional equivalence to LWOP around the demands of the Eighth Amendment as considered in *Contreras*, evaluating section 1170(d)'s distinction for those sentenced to LWOP in an equal protection context requires "an equal protection specific analysis" (*Thompson, supra*, 112 Cal.App.5th at p. 1073) as presented in *Hardin* and *Williams*.

As here, "when plaintiffs challenge laws drawing distinctions between identifiable groups or classes of persons, on the basis that the distinctions drawn are inconsistent with equal protection, … [t]he only pertinent inquiry is whether the challenged difference in treatment is adequately justified under the applicable standard of review." (*Hardin, supra*, 15 Cal.5th at pp. 850–851.) "[W]hen a statute involves neither a suspect classification nor a fundamental right, the 'general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.'" (*Id.* at p. 847.)

---

[7] We note that although appellant does not appear entitled to a youth offender parole hearing under section 3051, subdivision (h), he does appear eligible for an elderly parole hearing at age 50 under section 3055. (See § 3055, subds. (g), (h) [those excluded from eligibility does not include One Strike offenders].)

In the context of equal protection, therefore, "[i]nstead of asking whether a [44]-year-to-life term functions like [LWOP] with respect to Eighth Amendment concerns that constrain lawful punishment for juvenile nonhomicide offenders [under *Graham*], we must ask whether '"a statutory distinction [between [LWOP] and a [44]-year-to-life term] is so devoid of even minimal rationality that it is unconstitutional as a matter of equal protection."'" (*Thompson, supra*, 112 Cal.App.5th at p. 1074, quoting *Williams, supra*, 17 Cal.5th at p. 123 & citing *Munoz, supra*, 110 Cal.App.5th at p. 510, review granted.)

Although the parties center their respective analyses around *Contreras*'s Eighth Amendment formulation of LWOP functional equivalency, we follow *Thompson*'s lead and address appellant's as-applied challenge in the context of the equal protection framework under *Hardin* and *Williams*.

## B.      Equal Protection Principles

"The equal protection clause of the Fourteenth Amendment to the United States Constitution provides that no state may 'deny to any person within its jurisdiction the equal protection of the laws.'" (*Hardin, supra*, 15 Cal.5th at p. 847, fn. omitted, citing U.S. Const., 14th Amend.) "This provision is 'essentially a direction that all persons similarly situated should be treated alike.' [Citation.] 'At core, the requirement of equal protection ensures that the government does not treat a group of people unequally without some justification.' ([*People v.*] *Chatman* [(2018)] 4 Cal.5th [277,] 288.)" (*Hardin, supra*, at p. 847.)

The justification required to satisfy equal protection hinges on the type of unequal treatment at issue. (*Hardin, supra*, 15 Cal.5th at p. 847.) Heightened scrutiny is applied when a challenged statute or regulation involves a suspect classification such as race, or a fundamental right such as the right to vote, and these classifications require greater justification for the differential treatment. (*Ibid.*, citing *People v. Chatman* (2018) 4 Cal.5th 277, 288 (*Chatman*).) However, when a statute involves none of these suspect classifications or fundamental rights, as a general rule the legislation is presumed to be

valid and will be sustained if the classification is rationally related to a legitimate state interest. (*Hardin, supra*, at p. 847.)

"A court applying this standard finds 'a denial of equal protection only if there is no *rational* relationship between a disparity in treatment and some legitimate government purpose.' (*Chatman*[*, supra*, 4 Cal.5th] at pp. 288–289.)" (*Hardin, supra*, 15 Cal.5th at p. 847.) "The underlying rationale for a statutory classification need not have been 'ever actually articulated' by lawmakers, nor 'be empirically substantiated.' [Citation.] Evaluating potential justifications for disparate treatment, a court reviewing a statute under this standard must 'treat the statute's potential logic and assumptions far more permissibly than with other standards of constitutional or regulatory review.' [Citation.] 'If a plausible basis exists for the disparity, courts may not second-guess its "'wisdom, fairness, or logic.'"' [Citation.] '[T]he logic behind a potential justification need [not] be persuasive or sensible—rather than simply rational.'" (*Id.* at p. 852, fn. omitted.)

"To mount a successful rational basis challenge, a party must '"[negate] every conceivable basis"' that might support the disputed statutory disparity." (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881; accord, *Williams, supra*, 17 Cal.5th at p. 130 [a court must uphold the Legislature's classification against an equal protection challenge unless "'it fairly can be said there is no "reasonably conceivable state of facts that could provide a rational basis for the classification"'"].) The burden is on the party challenging the law to show that the challenged distinction in treatment is not adequately justified. (*Hardin, supra*, 15 Cal.5th at p. 851.)

## C. Rational Basis For Legislature to Treat Juvenile Offenders Sentenced to 44 Years to Life Differently From Juvenile's Sentenced to LWOP

The Legislature enacted what is now section 1170(d)(1)(A) in response to "concerns regarding sentences of [LWOP] for juvenile offenders." (*Kirchner, supra*, 2 Cal.5th at p. 1049; see Assem. Com. on Appropriations, Analysis of Sen. Bill. No. 9 (2011–2012 Reg. Sess.), as amended Aug. 15, 2011, pp. 3–5.) Although enacted after

26.

*Graham*, section 1170(d) was not designed to, nor does it, address Eighth Amendment violations in sentencing. As enacted, section 1170(d) resentencing relief is available only after a juvenile has been incarcerated for 15 years; it offers relief to homicide and nonhomicide juvenile offenders alike; it does not *require* a court to resentence *any* LWOP juvenile offender to a term-of-years; and it does not structure relevant resentencing factors to necessarily account for Eighth Amendment concerns. (§ 1170, former subd. (d)(2)(G); see *Kirchner, supra*, at p. 1052 ["section 1170(d)([1]) recall and resentencing process anticipates the lawfulness of a sentence of [LWOP] potentially subject to recall under its terms," and given its structure, it is not an adequate vehicle to address 8th Amend. error]; see also *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1385 [8th Amend. concerns of *Miller* and *Graham* not necessarily satisfied by opportunity for recall and resentencing under § 1170(d)].) While *Graham* was part of the Legislature's consideration in enacting section 1170(d)—as evidenced in the legislative history noting the decision (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.), as amended Aug. 15, 2011, p. 3)—legislative committee analyses reflect the Legislature's primary concern was with those juveniles whose sentences guaranteed their death in prison because they offered no opportunity for parole. (*Thompson, supra*, 112 Cal.App.5th at p. 1077.)

Specifically, legislative committee reports reflect concerns centered specifically on LWOP, not lengthy juvenile sentences generally. An Assembly Committee on Appropriations bill analysis included contentions of the bill's author and supporters that LWOP for juveniles is a "barbaric" sentence, "counter to principles of cognitive and emotional development in minors, and all but unprecedented in [the] rest of the world." (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.), as amended Aug. 15, 2011, p. 2; see *McHugh v. Protective Life Ins. Co.* (2021) 12 Cal.5th 213, 241 ["Where, as here, the author's statements are part of committee materials—and

are therefore relayed not merely as personal views, but instead as part of the Legislature's consideration of the bill—they can serve as salient reflections of legislative purpose."].)

Both the Assembly Committee on Appropriations and the Assembly Committee on Public Safety issued analyses that discussed statistics provided by the Senate Bill 9's author that were specifically relevant only to LWOP. For example, both analyses referenced background facts showing "45% of the minors sentenced to LWOP did not personally commit murder, but were convicted of felony murder—as accomplices in a felony during which a murder was committed"; and that recent developments in brain science "'have proven that youth are far more influenced by group behavior than the same individuals will be as adults'"—"'[u]nsurprisingly, over 75% of the youth sentenced to LWOP acted within a group at the time of their crime.'" (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.), as amended Aug. 15, 2011, p. 3; see Assem. Com. on Public Safety, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.), as amended May 27, 2011, pp. 7–8.)

Also included were background facts provided by the Senate Bill 9's author indicating many of California youth sentenced to LWOP were acting under the influence of an adult—in 70 percent of cases where the youth was not acting alone, at least one codefendant was an adult; and that California "'has one of the worst records in the nation for racial disparity in the imposition of [LWOP] for juveniles. African American youth are sentenced to [LWOP] at over 18 times the rate of white youth. Hispanic youth are sentenced to [LWOP] five times more often than white youth.'" (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.), as amended May 27, 2011, at pp. 7–8.) The analysis provided by the Assembly Committee on Appropriations also included information taken from a 2007 report by the Center for Law and Global Justice and the Frank C. Newman International Human Rights Law Clinic at the University of San Francisco School of Law that "'LWOP for minors violates customary international

law ….'" (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.), as amended Aug. 15, 2011, p. 4.)

As reasoned in *Thompson*, "[t]his history suggests the Legislature's concern was not merely excessive punishment of juveniles that failed to take into consideration their capacity for change, or even lengthy sentences.  Instead a specific goal was to provide an opportunity for juvenile offenders whose sentences ensured they would die in prison." (*Thompson, supra*, 112 Cal.App.5th at p. 1076.)  "At the time of enactment, the Legislature could reasonably consider [LWOP] to be the most severe and unjust punishment imposed on juvenile offenders."  (*Id.* at p. 1077.)  As in *Thompson,* appellant has not demonstrated how the Legislature's concerns regarding the harshest punishments guaranteeing death in prison apply equally to those sentenced to 44 years to life with parole eligibility at 60 years of age.

Appellant cites statistics showing the average age of California inmates who died in 2022 was 58.1 years old; the average age of male inmates who died in 2021 was 61 years old; and in 2019, the average age of death of male inmates was 57.5 years old.  Appellant also asserts his chance of obtaining parole at age 60 is not especially likely, and cites statistical data from the Board of Parole Hearings showing that in 2023, only 29 percent of parole grants were issued at an initial hearing, down from 38 percent in 2022.  Given these statistics, appellant argues his sentence, which offers parole eligibility at age 60, is functionally the same as LWOP and, thus, legislative concerns about juveniles being condemned to die in prison apply equally to him.

A similar argument was convincingly rejected in *Thompson*.  (*Thompson, supra*, 112 Cal.App.5th at p. 1077.)  The court reasoned that even if comparable statistics were credited on appeal when (as here) they had not been presented to the trial court, it was, at the time of enactment, only those juveniles sentenced to LWOP who "had a 100 percent chance of dying in prison."  (*Id.* at p. 1078.)  The court explained this was a distinction the Legislature "could rationally take into account."  (*Ibid.*)  Even considering appellant's

29.

data presented for the first time on appeal, the Legislature could have made a rational choice to target the harshest juvenile punishment first, and the one that *guarantees* the juvenile will die in prison. (*Williams, supra*, 17 Cal.5th at pp. 124–125 [under rational basis review, "'"we must accept any gross generalizations and rough accommodations that the Legislature seems to have made"'"].) A term-of-years that offers parole eligibility at 60 years of age is not a sentence that guarantees death in prison, like LWOP or like sentences of 103 years to life (*Heard, supra*, 83 Cal.App.5th at p. 629), 140 years to life (*Sorto, supra*, 104 Cal.App.5th at pp. 439–440) and 107 years to life (*Bagsby, supra*, 106 Cal.App.5th at pp. 1046–1047).

Moreover, the legislative history indicates the Legislature planned to proceed "incrementally in addressing the larger problem of excessive punishment of juvenile offenders." (*Thompson, supra*, 112 Cal.App.5th at p. 1076.) The Senate Appropriations Committee's fiscal summary of Senate Bill 9 indicated the law would apply to only 293 inmates in California, and the anticipated fiscal impact was calculated accordingly. (Sen. Appropriations Com. Fiscal Summary of Sen. Bill No. 9 (2011–2012 Reg. Sess.) as introduced Dec. 6, 2010.) Further, the bill was described by supporters as a "'modest and narrowly focused piece of legislation'" given the limited number of inmates the bill was anticipated to affect. (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.) as introduced Dec. 6, 2010, p. 11.)

The Legislature could rationally determine that "providing the relatively small number of juvenile offenders otherwise certain to die in prison an opportunity to obtain a lesser sentence was the most pressing priority." (*Thompson, supra*, 112 Cal.App.5th at p. 1077.) While this excludes juveniles with lengthy term-of-years sentences that do not guarantee their death in prison, the Legislature is "entitled to proceed incrementally, so long as it proceeds rationally, in 'walking [the] tightrope' of the political process." (*Hardin, supra*, 15 Cal.5th at p. 866.) "'Nothing compels the state "to choose between attacking every aspect of a problem or not attacking the problem at all[.]' [Citation.] Far

30.

from having to "solve all related ills at once" [citation], the Legislature has "broad discretion" to proceed in an incremental and uneven manner without necessarily engaging in arbitrary and unlawful discrimination.'" (*Williams, supra*, 17 Cal.5th at p. 125, quoting *People v. Barrett* (2012) 54 Cal.4th 1081, 1110.)

The Legislature's "line-drawing authority and ability to proceed incrementally has been recognized in numerous contexts, not limited to punishing relative culpability more severely, or to prescribing disparate punishments for different offenses." (*Thompson, supra*, 112 Cal.App.5th at pp. 1080–1081, citing *Chatman, supra*, 4 Cal.5th at p. 283; see *People v. Barrett, supra*, 54 Cal.4th at p. 1110 [recognizing Legislature's discretion to proceed incrementally in not authorizing jury trials or requiring jury trial advisements in Welf. & Inst. Code, § 6500 commitment proceedings, even though several other commitment schemes include such rights].) The Legislature's authority to sculpt a solution for a problem rationally perceived to be the most pressing is not subject to a court's "judgment on the wisdom or desirability of [the Legislature's] policy choices." (*Hardin, supra*, 15 Cal.5th at p. 864.)

Although rejecting equal protection challenges to section 1170(d) as applied to juvenile sentences of 50 years to life for homicide, *Thompson* and *Munoz* acknowledge "tough questions" remain regarding other term-of-years sentences with respect to equal protection challenges to section 1170(d). (*Munoz, supra*, 110 Cal.App.5th at p. 510, review granted; accord, *Thompson, supra*, 112 Cal.App.5th at p. 1081.) Determining what term-of-years sentence will result in the juvenile's certain death in prison and, thus, becomes rationally indistinguishable from a term of LWOP in light of the Legislature's purposes in enacting section 1170(d), becomes even more difficult where a sentence extends beyond 50 years. "What about 60 to life for a 15-year-old defendant? Or 53 years eight months to life for a 20-year-old defendant?" (*Munoz, supra*, at p. 510, review granted.) Those questions are not presented here, however, and we do not reach them.

In sum, as applied to juvenile nonhomicide offenders sentenced to 44 years to life, appellant fails to demonstrate section 1170(d)'s eligibility limitation has no rational basis and is therefore unconstitutional under the Fourteenth Amendment. (*Williams, supra*, 17 Cal.5th at p. 130 ["We must uphold the Legislature's classification against an equal protection challenge unless 'it fairly can be said that there is no "reasonably conceivable state of facts that could provide a rational basis for the classification."'"].)

## DISPOSITION

The trial court's order is affirmed.

MEEHAN, J.

WE CONCUR:

DETJEN, Acting P. J.

FRANSON, J.